**NICHOLAS & TOMASEVIC, LLP**
  Craig M. Nicholas (SBN 178444)
  Alex Tomasevic (SBN 245598)
  Shaun Markley (SBN 291785)
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL LUDLOW, individually and on behalf of others similarly-situated; and WILLIAM LANCASTER, individually and on behalf of others similarly-situated, | Case No. 3:18-cv-01190-JLS-JLB |
| | **FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT FOR:** |
| Plaintiffs, | |
| vs. | **(1)   FAILURE TO PAY OVERTIME UNDER THE FAIR LABOR STANDARDS ACT (FLSA);** |
| FLOWERS FOODS, INC., a Georgia corporation; FLOWERS BAKERIES, LLC, a Georgia limited liability company, FLOWERS FINANCE, LLC, a limited liability company; | **(2)   INJUNCTIVE RELIEF AND RESTITUTION UNDER CALIFORNIA'S UCL;** |
| | **(3)   FRAUD;** |
| Defendants. | **(4)   FAILURE TO PAY OVERTIME UNDER CALIFORNIA LAW;** |
| | **(5)   UNLAWFUL DEDUCTIONS FROM WAGES;** |
| | **(6)   FAILURE TO INDEMNIFY FOR NECESSARY EXPENDITURES;** |
| | **(7)   FAILURE TO PROVIDE PROPER WAGE STATEMENTS;** |
| | **(8)   USURY; AND** |
| | **(9)   VIOLATION OF CALIFORNIA'S UCL BASED ON USURY.** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Daniel Ludlow ("Ludlow" or "Plaintiff") and William Lancaster ("Lancaster" or "Plaintiff") (collectively "Plaintiffs"), individually and behalf of others similarly-situated, allege on information and belief as follows:

## I.    **INTRODUCTION**

1.    Flowers Foods, Inc., through its regional subsidiaries, deploys an elaborate fraud to cheat its employees, its competition, and the state and federal governments.    Flowers[1] does so, primarily, by willfully and systematically misclassifying its hundreds of delivery drivers as "Independent Contractors." (Sometimes referred to as "Delivery Employees.") In doing so, Flowers denies these Delivery Employees, including the named Plaintiffs, access to critical benefits and protections they are entitled to by law, such as minimum wage, overtime compensation, indemnification for business expenses, family and medical leave, unemployment insurance, and safe workplaces.    Through its willful misclassification, Flowers also robs the federal and state governments of tax revenues and generates losses to state unemployment insurance and workers' compensation funds and gets an undue advantage over its law-abiding competition.[2]

2.    Flowers sells billions of dollars of baked goods to retailers throughout the United States.  To help sustain its profits, Flowers has concocted a model where it advertises "independent contractor" distributor opportunities.  As part of the model, Flowers makes Delivery Employees purchase a specific sales territory in which the Delivery Employee is supposedly going to purchase, take title to, re-sell, and distribute Flowers' bakery products to the Delivery Employees' prearranged (by Flowers) customers. The Delivery Employees often pay in excess of $100,000 for the right to the "independent business opportunity" outlined in Flowers'

---

[1] As used here, "Flowers" refers to all Flowers Foods, Inc. and Flowers Bakeries, LLC —who carry out the acts described herein jointly.

[2] *See* U.S. Dept. of Labor, Wage and Hour Division, "Misclassification of Employees as Independent Contractors," available at https://www.dol.gov/whd/workers/Misclassification/ (describing the repercussions of misclassification) (last accessed June 1, 2018).

advertisements and its uniform Distributor Agreement ("DA"). Flowers even offers to finance the loans for these routes itself, or through subsidiaries, at illegal (usurious) rates – increasing the money it unjustly reaps from these workers.

3.      In short, Flowers sells the notion that these "independent contractors" will run and control their own sales-based business with their own customers for their own profit and gain.  But Flowers never *actually* operates its business under these terms, despite Delivery Employees' heavy investment and reliance on the promises Flowers makes.

4.      In reality, the distributor role is far from "independent."  For example, for the vast majority of product sales, Flowers itself contracts directly with its own large retailer customers (like Wal-Mart and Costco) and maintains title over the baking products until the retailers take possession. But in no case do Delivery Employees ever actually receive title to products that go into Flowers' retail locations. Instead, Delivery Employees merely deliver the product and stock Flowers' customers' shelves for a non-negotiable commission that Flowers unilaterally establishes.

5.      Flowers also dictates the set route or territory that the Delivery Employees sell within.  Flowers maintains control over that territory or route with respect to things like which Flowers' products will be available, price, shelf space, displays, and promotions.  Flowers also unilaterally dictates when unsold bakery products must be reclaimed from retail locations (a.k.a. "stales" or stale product) as dictated by its retail customers and passed down to Delivery Employees.  Curiously, even though Flowers purports to pass "title" to the bakery products to the "independent distributors," Flowers mandates that stale products must be returned to Flowers warehouse and not used for any other purpose by the Delivery Employees, even where they are forced to pay market price for them.

6.      Flowers also dictates which products and brands of goods will be sold within each territory. Notably, if Flowers elects to change which retailers it serves

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

or which brands it will carry, the Delivery Employee does not receive a corresponding change in the valuation of the route that he was forced to buy. This is true even where Flowers drastically devalues the Delivery Employee's route because Flowers unilaterally chose to discontinue a certain brand or stop selling to a particular retailer within that route.

7.     Flowers also hires management and sales employees at each of its local, regional subsidiaries to carry out sales and to directly supervise and instruct the so-called "independent distributors" in performance of their distribution and merchandizing responsibilities within their routes.

8.     Flowers also controls the Delivery Employees' appearance as well as the appearance of their vehicle. For example, Flowers can make Delivery Employees paint their vehicles to Flowers' specifications or remove advertising that the Delivery Employee has chosen for his/her vehicle.

9.     Delivery Employees must also abide by "Good Industry Practices" as defined unilaterally by Flowers. Failure to abide by any of these requirements risks termination by Flowers and often results in "breach notices" by Flowers where it insists on specific performance obligations with the threat of fines or termination.

10.     As such, rather than operating the sales-oriented independent business promised to them, Delivery Employees primarily carry out a vital portion of Flowers' direct-store-delivery ("DSD") business operations—delivering and merchandizing bakery products to Flowers retail customers for a set commission.

11.     The discrepancy between the business model set forth in Flowers' DA and the one actually put in place by Flowers is not accidental. Flowers sees its DSD model, and specifically the use of "independent distributors," as a significant competitive advantage. It wants, and legally it *needs*, the appearance of separate, independent businesses to avoid having to treat "distributors" as employees. Yet, at the same time Flowers must be able to ensure delivery to its blue-chip retail customers and control the timely and effective distribution of its products pursuant

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

to the terms of its contracts with those retailers. Attempting to walk this invisible line or to simply capture the best of both worlds, Flowers presents the illusion of independence in its DA and related advertisements with no intention of actually operating its business as necessitated by its retail customers and its personal preference.

12.    Plaintiffs are present Delivery Employees who entered into the DA with Flowers. Plaintiffs bring this action on behalf of themselves and other similarly situated Delivery Employees. This hybrid action is brought as a "collective" action under the Federal Labor Standards Act ("FLSA") as well as a Federal Rules of Civil Procedure, Rule 23 class action based on numerous violations of California state law and the California Constitution's prohibitions on usury.  Plaintiffs seek recovery for fraud, lost wages (including overtime), unfair competition, as well as an injunction putting an end to Flowers' bait-and-switch "independent distributor" business model. They also seek reimbursement for business expenses and illegal deductions.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over Plaintiff's federal law FLSA claims pursuant to Title 28 of the United States Code, Sections 1331 and 1343(a)(4), because these claims seek redress for violations of Plaintiff's federal civil and statutory rights. There is also diversity among the parties as Plaintiff is a California citizen who brings claims against out-of-state Defendants. The value of these claims readily exceeds the jurisdictional minimum.

## III.    THE PARTIES

14.    Plaintiff Daniel Ludlow is, and at all times mentioned was, an individual residing in the County of San Diego, California.  Daniel Ludlow is employed by and works for Defendants as a distributor in the State of California, County of San Diego. Daniel Ludlow has been employed by Defendants from approximately 2013, through present.

15.    Plaintiff William Lancaster is, and at all times mentioned was, an individual residing in the County of San Diego, California.  Lancaster is employed by and works for Defendants as a distributor in the State of California, County of San Diego. Defendants employed Lancaster from approximately 2013, through present.

16.    Defendant Flowers Foods, Inc. ("Flowers Foods"), is a publicly traded Georgia corporation with its principal place of business in Thomasville, Georgia (NYSE:FLO). It is a leading manufacturer and seller of bakery goods in the United States with gross profits of over $1.9 billion in 2017 (and of over $581 Million in the first quarter alone of 2018). It does business in the County of San Diego, California by establishing subsidiaries with the intent of carrying out operations in this region. This entity establishes layers of national and regional subsidiaries to carry out its sham "independent distributor" business model that in fact just secures workers to carry out the delivery and merchandizing of Flowers' customers' retail locations. Flowers Foods ultimately takes responsibility for and recognizes all revenue generated from its sale of bakery goods through its local subsidiaries and its Delivery Employees. It also guarantees and assumes responsibility for the performance of its subsidiaries that execute the DA with Delivery Employees (sometimes called "local subsidiaries") throughout California. Specifically, "Flowers Foods, Inc. will absolutely and unconditionally guarantee the performance by [its local subsidiary] of [the subsidiary's] obligations under the Distributor Agreement." As a result, Flowers Foods, along with Flowers Bakeries, LLC, are ultimately, and jointly, responsible for these claims.

17.    Flowers Bakeries, LLC, is a Georgia limited liability corporation with its principle place of business in Thomasville, Georgia. This entity is the Flowers Foods subsidiary that is charged with sales related activities. It negotiates with retailers on things such as price, shelf space, and service requirements that are then carried out by the Delivery Employees at the direction of the local subsidiaries.

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

Results of these high-level deals make their way down through the local subsidiaries to the Delivery Employees.

18.    One step further down the Flowers' chain is the local DSD subsidiaries such as non-parties Flowers Baking Co. of California, LLC and Flowers Baking Co. of Modesto, LLC.[3] These entities' only member is Flowers Bakeries, LLC (who in turn is entirely owned by Flowers Foods). These local subsidiaries are set up to execute the policies and instructions passed down from the higher up Flowers entities (the Defendants). Each local subsidiary has a president, a vice president of sales, and a director of distributor relations, along with several directors of sales/sales managers. These employees execute sales and pricing agreements as well as visit the actual brick-and-mortar locations that Flowers has contracted to service to keep up customer relationships and ensure the Delivery Employees are meeting their needs as specified in the Flowers Foods negotiated contracts (that Delivery Employees ultimately are tasked with carrying out). They also act as the go-between for Delivery Employees and the other Flowers entities.

19.    Flowers Finance, LLC ("FloFin") is a Delaware limited liability company whose only member is Flowers Foods, Inc. FloFin's principal place of business is at the same Thomasville location as the other named Flowers entities. FloFin finances the routes purchased by many California Flowers Delivery Employees like Plaintiff William Lancaster. FloFin impermissibly charges interest at a rate exceeding 12 percent in violation of California's Constitution and UCL.

20.    All of these entities, including Defendants, are part of the Flowers enterprise that jointly and collectively manufacture, advertise, sell, and distribute bakery products throughout California and the United States. They operate jointly in

---

[3] On information and belief, Flowers Foods initially established a California-wide local subsidiary called Flowers Baking Co. of California which later split and transferred its Northern California operations to Flowers Baking Co. of Modesto and its Southern California operations to Flowers Baking Co. of Henderson around February 2014.   With the transfers assigned all of its Distributor Agreements to these new entities.

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

carrying out the common fraud and misclassification against their Delivery Employees and the state of California.

## IV.    GENERAL ALLEGATIONS

### A.    Overview of Flowers' Business

21.    Flowers Foods, Inc. is a leading national packaged bakery foods company. It bakes, sells, and distributes breads, buns, rolls, snack cakes, and tortillas, among other items throughout the country under well-known brand names like "Wonder Bread," "Sunbeam," "Tasty Cake," "Nature's Own," and "Dave's Killer Bread." It has two business segments—a direct-store-delivery segment ("DSD Segment") and a warehouse delivery segment. The DSD Segment is at issue here. It produces a wide variety of fresh bakery foods that are sold through a DSD route delivery system to Flowers' retail and foodservice customers in California and other locations.

22.    Within the DSD segment, Flowers Foods, Inc. establishes a web of wholly-owned subsidiary companies to enter into agreements with the "Delivery Employees," such as Plaintiff, who are charged with delivering the bakery products from the warehouse to the retail locations and keeping the shelves stocked. According to Flowers Foods, Inc.'s website, it "sells its products *through* a network of independent distributors [*i.e.*, Delivery Employees] to retail and foodservice customers." (https://www.flowersfoods.com/investors/flo-overview/at-a-glance [emphasis added].)    These Delivery Employees are, thus, integral to Flowers' normal business operations—and they are selling *for Flowers,* not themselves.

### B.    How Flowers Sells Its So-Called "Independent Distributor Opportunity" to Delivery Employees.

23.    Flowers classifies Delivery Employees as "independent contractors" and advertises routes as independent business opportunities for Delivery Employees where the Delivery Employees supposedly buy product from Flowers and re-sell it for a profit. Specifically, in disclosure documents, Flowers represents that the

independent contractor Delivery Employee will "pay [Flowers] for the bakery products [distributor] purchase[s] for resale to [distributor's] outlets." It reiterates that Flowers "will sell [bakery products] to [distributor] at terms and prices established by [Flowers], and [Flowers] will derive income from these sales. Upon delivery, these products will belong to [the distributor]."

24.     Flowers makes the same representations in the form DA presented to every Delivery Employee. Flowers states that, under its system, it seeks to divide its bakery goods market into territories operated by "independent contractor distributors." Flowers claims to grant the right both to sell and distribute authorized Flowers products within the territory. Under this model, as described in the DA, the Delivery Employee will purchase from Flowers, take ownership of the product, and then resell the products to retail outlets within their territories at a profit.

25.     By claiming that the Delivery Employee is "purchasing" the products from Flowers, Flowers feels it can pass certain business risks to the Delivery Employee. So Flowers makes the Delivery Employees, like Plaintiff, assume the risk of loss for non-payment by Flowers' retail customers, loss resulting from missing or otherwise unaccounted for inventory, and loss resulting from excess stale products.

26.     In short, and in no uncertain terms, the disclosure documents and the DA claim that: (1) Flowers sells bakery products to Delivery Employee; (2) Delivery Employee takes title; and (3) Delivery Employee re-sells to retailers at a profit. In the scenario described by Flowers, Flowers makes a profit by selling to the distributor and passing off title at that time. The Delivery Employee then executes its own independent sale to the retailer. Furthermore, Flowers describes itself, in the DA, as merely the agent of the Delivery Employee in reaching agreements for purchases with retail chain accounts that the Delivery Employee then executes. In its description of this tripartite relationship, Flowers states that it will merely carry accounts receivable for these retail accounts and credit the retail sales price to Delivery Employees.

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

27.     Flowers uses its described business model to both (1) justify the "independent" nature of Delivery Employees in an effort to support its misclassification of them as independent contractors, and to (2) justify passing business losses and risks to the Delivery Employees who supposedly "take title" to the products.

### C.     Flowers' *Actual* Business Model

28.     Flowers' representations in its disclosure documents and in its DA are false as evidenced by its own statements and accounting policies. To summarize, Flowers represents to Delivery Employees that they own the product and control their destinies.  It does that to justify its misclassification of the Delivery Employees as "independent contractors," and to thus avoid the wages, employer-side taxes, and other protections and burdens that would normally come with properly categorizing these workers as "employees." It also does this to justify passing certain risks and losses to the Delivery Employees.  But on the other hand, and as proven by its actions as well as what Flowers tells accountants and the Securities and Exchange Commission ("SEC"), <u>Flowers</u> is the one that controls the entire enterprise and actually owns the product.  Upon information and belief, this allows Flowers to claim higher revenues and present a healthier business to potential customers and its investors. In short, Flowers is having its cake and eating it too.

29.     More specifically, rather than selling to and vesting rights in the distributors to make retail sales, Flowers itself negotiates, carries out, and receives gross proceeds from the vast majority of bakery sales which are in turn merely delivered by its "distributors" who receive a commission based on Flowers' sales. The reality of selling products to national retailers like Wal-Mart and Costco is that deals are negotiated on a national, or at least regional level and then simply carried out by the local subsidiaries that make up Flowers' DSD Segment. Sales to these retailers accounts for over 75% of Flowers' business in the increasingly corporate "big retail" market that exists in the United States and California.

30.    Flowers' own website and SEC filings confirm that the distributors merely have "the right to distribute," and that sales are actually made and controlled by Flowers (*i.e.*, Flowers sells products "*through*" distributors). It is Flowers who enters contracts for retail purchase and negotiates all relevant retail terms like pricing. Individual distributors do not, for example, have a contract with the local Wal-Mart within their territory and have no control over the price Wal-Mart agrees to pay Flowers for products that distributors put on Wal-Mart's shelves. Price, product selection, and even product placement within these retail locations are all controlled by Flowers well above the Delivery Employees' level of operation.

31.    Under Flowers' actual business model, Delivery Employees do not, in-fact, take title and then resell the products. Instead, Flowers executes sales with retail locations and "distributors receive a percentage of the wholesale price of product sold to retailers and other customers." In doing so, and as a matter of accounting, Flowers then actually recognizes the sale to the retail customer as revenue "at the time of delivery when title and risk of loss pass to the [retail] customer." *See* Flowers' SEC Form 10-K for fiscal year ended January 1, 2011 ("2011 SEC Filing") at p. F-7.[4]  Flowers does *not* recognize the revenue when it supposedly "sells" the products to the Delivery Employees because no sale to these individuals actually occurs. Indeed, in its SEC filings, Flowers explicitly admits that it bears risk of loss and owns title to the products until the retailer or end consumer (like Wal-Mart) actually takes possession. This directly contradicts the representations that Flowers makes to its "distributors," including in the DA, where Flowers claims the Delivery Employees "buy" the product from Flowers and own it upon taking possession.[5]

32.    Flowers' most recent quarterly SEC filing removes any doubt that the DA and its related disclosures are a sham. In its filing, Flowers explicitly admits

---

[4] https://otp.tools.investis.com/clients/us/flowers_foods/SEC/sec-show.aspx?Type=html&FilingId=7747320&CIK=0001128928&Index=10000.

[5] A "sale" consists of passing of title from the seller to the buyer. *See* U.C.C. 2-106.

that, for purposes of sales to its retail chain customers (the vast majority of Flowers products sold), <u>Flowers</u> is the principal, and the employee distributor is the "agent." *See* Flowers' Form 10-Q for the quarterly period ended April 21, 2018 ("2018 SEC Filing"), at p. 9.[6]  This directly contradicts what Flowers told the employee distributors, including Plaintiff, in the franchise disclosure and the DA.

33.  In that recent filing, Flowers also admits again that revenue is recognized based on the retail sales price (as opposed to the wholesale price it supposedly "sells" products to the Delivery Employee for) only once product is delivered to the end customer. Additionally, "[t]he company retains inventory risk, establishes . . . pricing, and fulfills the contractual obligations for [retail] sales." *See* 2018 SEC Filing at p. 9-10. Again, Flowers wants to save money on wages and employment taxes by claiming that employees are "independent distributors," but it needs to maintain control over the enterprise, the products, and the distribution networks to satisfy its other financial and accounting goals.[7]

34.  Additional facts proving Flowers' control over the relationship with its Delivery Employees (and thus the falsity of the "independent contractor" classification) are as follows:

a.  Delivery Employees are forced to incorporate and retain a majority ownership in their corporation. *I.e.*, they cannot choose their own business form.  This forced corporation then enters into the DA with the Flowers Foods, Inc. subsidiary to show the appearance of a business-to-business relationship.

---

[6] https://otp.tools.investis.com/clients/us/flowers_foods/SEC/sec-show.aspx?Type=html&FilingId=12761070&CIK=0001128928&Index=10000.

[7] Notably, prevailing accounting standards dictate that in order for Flowers to claim, as it repeatedly does, that it is the principal and the distributor is the "agent" in the arrangement, Flowers must be the one that has control over the "right to a service to be performed by [the distributor], which gives [Flowers] the ability to direct [the distributor] to provide the [distribution] service to [retail] customer. . . ." *See* Accounting Financial Standards Board (FASB), Topic 606.  This, of course, is directly at odds with Flowers' characterization of the distributors as "independent contractors" that make their own sales and over whom they allegedly lack control.

b.      Despite the forced incorporation, the Delivery Employee himself or herself must personally guarantee the contract. The personal guarantee makes the individual Delivery Employee liable for performance under and compliance with the DA. This gives Flowers its desired individual employee.

c.      Flowers assigns each Delivery Employee a set route and set brands of Flowers' bakery products to sell within that route to Flowers' retail customers. Delivery Employees pay for the rights to the route.  The price is usually $100,000 or more, financed with FloFin at excessive interest rates. Moreover, Flowers usually finances the purchase of the route at exorbitant interest rates. Flowers then automatically deducts the principal and interest from the commissions otherwise owed to the Delivery Employees.

d.      Flowers also controls: (i) which retailers will receive which Flowers' products within the territory; (ii) the price its retailers pay for products; and (iii) which products and brands of goods will remain available to the retailers and, in turn, to the Delivery Employees.

e.      Flowers maintains the right to change which retailers it and its Delivery Employees serve and which brands will be sold to those retailers or otherwise available within a Delivery Employee's territory.

f.      When Flowers makes changes to the products offered and/or the retailers it offers them to, it does not re-value the route the Delivery Employee originally bargained for or otherwise re-evaluate the money the individual owes to Flowers for that route. This is true even where Flowers has drastically reduced the value of a given route by unilaterally choosing to discontinue a product or stop selling to a retailer in that territory.

g.      Flowers deploys a management structure within each local subsidiary including branch and/or sales managers who manage relationships with retail customers, carry out sales, and directly supervise and instruct the Delivery

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

1  Employees in performance of their responsibilities.  Again, the distributors are not

2  "independent."  They have bosses at Flowers.

3        h.     Flowers also dictates when unsold bakery products must be

4  reclaimed from retail locations (a.k.a. "stales" or stale product).  Flowers demands

5  that such products, despite supposedly being the "property" of the Delivery

6  Employee, be returned to a Flowers warehouse for <u>Flowers</u>' further benefit or re-

7  sale, not the Delivery Employees. For example, if there is stale product within a

8  Delivery Employee's territory above the threshold level unilaterally established by

9  Flowers, Flowers charges the Delivery Employee retail price for the products but

10  maintains possession of these products itself and, on information and belief, sells

11  these products to its thrift customers.

12        i.     Delivery Employees must also agree to maintain a certain

13  physical appearance for both themselves and their vehicles. Flowers retains and

14  exercises the right to force Delivery Employees to paint their vehicles to Flowers'

15  specifications or remove advertising that the Delivery Employees have chosen for

16  their vehicle.

17        j.     Delivery Employees must abide by "Good Industry Practices" as

18  defined by Flowers. Failure to abide by any of these requirements risks termination

19  by Flowers.

20        k.     The DA has no end date and Delivery Employees often work for

21  Flowers for long periods of time. Per Flowers, these are "long-term financing

22  arrangements."

23        l.     Flowers sets a calendar or schedule of days that Delivery

24  Employees must work and what tasks are to be completed on those dates (*i.e.*,

25  managing inventory vs. dropping new product). Flowers also requires that work be

26  performed on the route each day of the week as its customers require and expect

27  under their contracts with Flowers.  Flowers describes its frequency of deliveries and

28

shelf-stocking as "an increasingly important competitive factor" over its competition and it needs to control Delivery Employees to perform accordingly.

m.    Finally, When Flowers cannot find a Delivery Employee to service a particular route or territory, it uses its own employees to perform the same distribution and merchandizing work. Also, when Flowers is starting up in a new area, it uses a temp agency (that classifies drivers as employees) to conduct this very same work. In short, Flowers and other companies routinely treat individuals performing the same work as Delivery Employees as employees and not independent contractors. The choice to make Delivery Employees "independent contractors" is simple cost avoidance. *See, e.g.,* Flowers' 2018 SEC Filings at p. 47 ("In the current quarter, a larger portion of our sales were made through independent distributors resulting in increased distributor distribution fees as a percent of sales and decreased workforce-related costs as a percent of sales . . . [which, among other things] resulted in a decline in workforce related costs."); *and see e.g.* Flowers' SEC Form 10-K for fiscal year ended December 28, 2013 ("2014 SEC Filing") at p. 39 ("The increase in workforce-related costs was primarily attributable to the Lepage and Sara Lee California acquisitions as they generally did not use independent distributors to deliver product for the majority of 2013. We transitioned the Sara Lee California and are transitioning the Lepage operations to the independent distributor model which will, over time, decrease the workforce-related costs and increase the distributor distribution fees.")[8]

**D.    Flowers Does Not Reimburse for Ordinary Business Expenses, and Also Charges Illegal Fees to its Employees.**

35.    Flowers does not reimburse Delivery Employees for ordinary business expenses. These include payments Delivery Employees make in the ordinary course

---

[8] https://otp.tools.investis.com/clients/us/flowers_foods/SEC/sec-show.aspx?Type=html&FilingId=9795456&CIK=0001128928&Index=10000.

of their work for Flowers such as expenses relating to use of their personal cars and delivery trucks, business licenses, insurance, and tax.

36.    Moreover, Flowers actually charges Delivery Employees, including Plaintiff, for the pleasure of delivering for Flowers.  For instance, Flowers charges recurring, non-negotiable fees as part of their operation. This includes, but is not limited to a warehouse fee, an administrative fee, and a technology fee (for use of Flowers required handheld computer equipment).

37.    Flowers also charges Delivery Employees for (excess) stale, lost, stolen, or otherwise unaccounted retail inventory.  As such, distributors illegally serve as insurers of the Flowers' merchandise. *See, e.g., Quillian v. Lion Oil Company*, 96 Cal. App. 3d 156, 161 (1979); *Kerr's Catering Service v. Department of Indus. Relations*, 57 Cal. 2d 319, 327 (1962) ("The employees, through this device, are in effect made insurers of the employer's merchandise, and the commissions earned by the employees which are subject to the deduction serve the same purpose as an employee's 'bond' exacted by the employer to cover shortages.").

**E.    Flowers, through FloFin, Charges Interest Exceeding California's Usury Limits.**

38.    Flowers makes money from its hard-working Delivery Employees in many other ways.  For instance, FloFin, a Flowers subsidiary, offers to "finance" the expensive routes that Flowers makes the Delivery Employees buy.  For this it collects interest.

39.    Specifically, many Delivery Employees including Mr. Lancaster finance their route purchases through Flowers and FloFin pursuant to a purported promissory note. Pursuant to the note, the Delivery Employee grant FloFin a security interest in the rights granted under the Distributor Agreement and promise to repay the note, with interest, over a term of years. In exchange, FloFin claims it will loan

and "disburse" funds to the regional Flowers entity that was established to hold and sell the route.

40.     In reality, no real money actually goes anywhere.  Flowers and FloFin basically just create a digital accounting ledger entry (or entries) reflecting an obligation for the Delivery Employee to pay Flowers/FloFin many payments over months.   FloFin then tacks on 12.1677 percent as interest.

41.     While the whole "loan" transaction is itself deceptive, the interest rate is, at a minimum, illegal.  It exceeds California's usury limit under Article XV, § 1 of the California Constitution (the higher of 10 percent, or 5 percent plus the prevailing rate of the Federal Reserve Bank). FloFin is not exempt from California's Constitutional usury lending cap. As a result, Mr. Lancaster and the Usury Sub-Class have incurred substantial injury and have been forced to pay usurious amounts of interest that must be refunded on top of the other wages and damages recoverable through these claims.

## V.     COLLECTIVE ACTION ALLEGATIONS

42.     Plaintiffs bring the first Cause of Action below as a collective action against Flowers under the FLSA on behalf of themselves and all similarly situated individuals. The proposed FLSA Collective Class ("FLSA Class") is defined as:

> All persons who worked pursuant to a "Distributor Agreement" or similar arrangement with Flowers Food, Inc., or one of its subsidiaries, in California that were classified as "independent contractors" during the period commencing three years prior to the commencement of this action through the close of the Court-determined opt-in period.

Discovery and investigation are continuing and Plaintiffs reserve the right to modify this definition prior to conditional certification of the FLSA Collective Action.

43.     To the extent tolling operates to toll claims by the FLSA Class against Defendants, the applicable statute of limitations and period for calculating damages should be adjusted accordingly.

44.     Defendants are engaged in communication, business, and transmission throughout the United States and are, therefore, engaged in commerce within the meaning of Title 29 of the United States Code Section 203(b).

45.     Plaintiffs have consented in writing to be a part of this action pursuant to Title 29 of the United States Code Section 216(b).

46.     Plaintiffs and members of the FLSA Class are similarly situated in that they signed a DA or similar contract, have substantially similar job requirements, receive similar or identical pay, and were required to work under the same uniform conditions and systems.

47.     This action meets all prerequisites for the maintenance of a collective action under the FLSA.  Also, the persons who comprise the FLSA Class exceed 100 persons and are therefore so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a collective class will benefit the parties and the Court.

48.     Nearly all factual, legal, statutory, declaratory, and injunctive relief issues raised in this Complaint are common to the FLSA Class and will apply uniformly to every member of the FLSA Class.

49.     The representative Plaintiffs will fairly and adequately represent and protect the interest of the FLSA Class, and has retained attorneys who are competent and experienced in similar litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the FLSA Class that would make collective treatment inappropriate. Counsel for the FLSA Class will vigorously assert the claims of the entire FLSA Class.

50.     Notice of this lawsuit should be sent to the FLSA Class and Plaintiffs will move for this after filing this Complaint. These individuals are readily identifiable through Flowers' records.

## VI.    FRCP RULE 23 CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring causes of action three through seven as a class action against Flowers pursuant to Rule 23 of the Federal Rules of Civil Procedure and pursuant to Flowers' many violations of California state law. The proposed Rule 23 Class ("California Class") is defined as:

> All persons who worked in California pursuant to a "Distributor Agreement" or similar arrangement with Flowers Food, Inc., or one of its subsidiaries, that were classified as "independent contractors" during the period commencing four years prior to the commencement of this action through judgment.

52.    Plaintiff William Lancaster bring the eighth cause of action as a class action against FloFin and Flowers Foods, Inc. pursuant to Rule 23 of the Federal Rule of Civil Procedure, on behalf of the following sub-class of individuals already in the California Class:

> All members of the California Class who received financing at interest rates above 10 percent from Flowers Finance, LLC, Flowers Foods, Inc., and/or its subsidiary(ies) for the purchase of a Flowers' route or territory (the "Usury Sub-Class").

53.    Plaintiffs reserves the right to modify this definition prior to certification of the California Class.

54.    To the extent equitable tolling operates to toll claims by the California Class or Usury Sub-Class against Defendants, the applicable statute of limitations or recovery period should be adjusted accordingly.

55.    Members of the California Class and Usury Sub-Class are so numerous that their individual joinder is not practicable. On information and belief, there are in excess of 400 members of the California Class and 325 members of the Usury Sub-Class.

56.    There are numerous questions of law and fact common to the California Class which predominate over any individual issues. These include:

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

(a)    The proper interpretation of the DA;

(b)    Whether Plaintiffs and the members of the California Class were misclassified as independent contractors under California law;

(c)    Whether Flowers' misclassification of Plaintiffs and the California Class as independent contractors was willful and/or intentional;

(d)    Whether failing to reimburse Plaintiffs and the members of the California Class for ordinary business expenses was illegal;

(e)    Whether the deduction from Plaintiffs' and the members of the California Class' wages were illegal under California law; and

(f)    Whether Flowers' representations and omissions to Plaintiffs and the California Class were illegal, unfair, or otherwise deceptive in violation of California's UCL.

57.    There are numerous questions of law and fact common to the Usury Sub-Class which predominate over any individual issues. These include:

(a)    Whether financing exceeded California's usury limits;

(b)    Whether FloFin's business practices were such that punitive or exemplary damages are appropriate.

(c)    What remedies may be had based on the violations of California usury law.

58.    Plaintiffs' claims are typical of the other members of the California Class because Flowers' uniformly enters DA contracts with its distributors classifying them as "independent contractors" and treats them as such. This means none of these individuals got the benefits of California's Labor Code and Wage Orders to which they were entitled. Likewise Flowers, through FloFin and potentially similar entities, enters into "promissory notes" for the financing of routes or territories to Distributor Employees with impermissibly high interest rates.

59.    Plaintiff Lancaster's claims are typical of the other members of the Usury Sub-Class because his FloFin interest rate exceeded that permitted by the California Constitution.

60.    Plaintiffs will fairly and adequately represent and protect the interests of the California Class, and has retained attorneys who are competent and experienced in Class Action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the California Class that would make class certification inappropriate. Counsel for the California Class will vigorously assert the claims of all California Class members.

61.    Class treatment is superior to individualized treatment.  Furthermore, without class certification and determination of declaratory, injunctive, statutory, and other legal questions within a class format, prosecution of separate actions by individual members of the California Class will create the risk of: inconsistent or varying adjudications with respect to individual members and/or establishing incompatible standards of conduct for the parties opposing the California Class which would, as a practical matter, be dispositive of interests of other members not party to the adjudication. This would substantially impair or impede their ability to protect their interests.

62.    Additionally, Defendants have acted or refused to act on grounds generally applicable to the California Class and Usury Sub-Class, making class-wide relief appropriate with respect to the California Class as a whole. Flowers classifies each individual entering into a DA as an independent contractor and uniformly treats them as such.  Likewise, the interest rates are uniformly in violation of California law.

[*rest of page intentionally left blank*]

# VII.  FIRST CAUSE OF ACTION

### Failure to Pay Overtime under the FLSA
### (By Plaintiffs on Behalf of Themselves and the FLSA Collective Class Against Flowers)

63.    Plaintiffs incorporate each and every allegation contained above.

64.    Plaintiffs bring this cause of action on behalf of themselves and the FLSA (collective) Class.

65.    The FLSA (at Section 207(a)(1)) requires overtime pay at a rate not less than one and one-half times an employee's regular rate for work over forty hours in a week.

66.    Flowers' Delivery Employees, including Plaintiffs, regularly worked (and continues to work) between 55 and 70 hours per week and 6 to 7 days per week in accord with Flowers' mandated schedule.  Yet Flowers never paid Plaintiffs or any member of the FLSA Class any of the overtime pay they had earned.

67.    Flowers knows that these workers are improperly classified and that they work well over 40 hours per week, but intentionally and willfully fails to provide overtime premium pay.

68.    Plaintiffs and the FLSA Class are thus entitled to, and hereby seek certification as a collective action, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by the FLSA.

# VIII.  SECOND CAUSE OF ACTION

### Injunctive Relief and Restitution under California's UCL
### (By Plaintiffs on Behalf of Themselves and the California Class Against Flowers)

69.    Plaintiffs incorporate by reference each and every allegation contained above.

70.    Plaintiffs bring this cause of action on behalf of themselves and the California Class.

71.    Flowers willfully and intentionally misclassified (and continues to misclassify) Delivery Employees as "independent contractors," harms competition in the state, and robs California (and the federal government) of payroll, employment, and related taxes. California's Unfair Competition Law ("UCL") provides for injunctive and restitutionary relief for just this type of situation.

72.    Flowers' conduct is deceptive.  Flowers willfully misclassifies its Delivery Employees as "independent contractors" knowing that the classification is false as a matter of law.  Furthermore, Flowers' representations made throughout its DA and related disclosures are false.  Flowers claims and tells Delivery Employees that they will work as "independent distributors" who will operate an independent business and have the right to buy, take title to, and re-sell bakery products.  These representations are untrue, deceptive, misleading, unfair, and illegal. On information and belief, Flowers continues to make these false representations and retain payments made by Delivery Employees under the DA contracts based on these false representations.

73.    Flowers' conduct is also unlawful under the UCL in that it violates numerous provisions of the FLSA (as described above) as well as the California Labor Code provisions demanding proper classification of employees, proper payment of wages, and reimbursement for regular work expenses, among other protections.[9]

74.    Flowers' conduct is also "unfair" under the UCL because it has a great and deleterious effect on its victims (including Plaintiff, the California Class, competitors, and the state and federal governments) and it has no legal justification. Flowers' motives in conducting itself in this manner are driven purely by anticipated profits. *See* ¶ 29(m), *supra*; *see also* representations made on Flowers' website and SEC filings touting the independent contractor model within its DSD Segment as a

---

[9] The California laws that Defendants violated and continue to violate include, but are not limited to, California Labor Code sections 510, 221, 223, 2802, and the related Wage Orders of the California Industrial Welfare Commission.

"significant competitive advantage." On information and belief, Flowers' classification of Delivery Employees as "independent contractors" is also unfair to its competitors in California who properly classify the same and similar distribution workers as employees, incurring the additional costs associated with that classification. *Id.* (evidencing that other companies like Sara Lee classified distribution workers as employees). Additionally, Flowers' business practices offend established public policies regarding the protection and proper classification of workers and the practices are also immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

75.   Plaintiffs, therefore, seeks an order enjoining Flowers from continuing to conduct these business practices, including willfully misclassifying employees as "independent contractors," and continuing to make the untrue, deceptive, misleading, unfair, and illegal representations associated with its "distributor" agreements.

76.   If Flowers is not enjoined from engaging in the unlawful business practices described above, Plaintiffs and the general public will be irreparably injured. The exact extent, nature, and amount of such injury is difficult to ascertain at this time.

77.   Plaintiffs have no plain, speedy, and adequate remedy at law.

78.   The success of Plaintiffs in this action will result in the enforcement of important rights affecting the public interest by conferring a significant benefit upon the general public.

79.   Furthermore, private enforcement of these rights is necessary as no public agency has pursued enforcement.  There is a financial burden incurred in pursuing this action, and it would be against the interests of justice to require the payment of attorneys' fees from any recovery in this action.

80.   Furthermore, Plaintiffs and the California class have lost money or property as a result of Flowers' unfair competition.

81.     Plaintiffs, on behalf of themselves and the California Class, therefore seek, in addition to an injunction, restitution of lost wages, territory payments, and other fees Flowers charged distributors in exchange for their "independent businesses" under the DA. Flowers, in short, should not be able to retain payments collected from distributors under its sham DA contract that Flowers freely disregards, especially when such retentions against employees are illegal under California employment law.

82.     Plaintiffs also seeks an order declaring that Flowers' practices described in this Complaint and its DA violate the UCL, as well as public injunctive relief prohibiting Flowers from engaging in the same or similar business practices in California in the future.

## IX.   THIRD CAUSE OF ACTION

### Fraud
### (By Plaintiffs and the California Class against Flowers)

83.     Plaintiffs incorporate by reference each and every allegation contained above.

84.     Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class.

85.     In its DA and related disclosures, Flowers uniformly represented to Plaintiffs and other Delivery Employees, in writing, that they would have the right to independently operate their own business in which they would buy, take title to, and re-sell bakery products for a profit. In this scenario, Flowers represented that Flowers would act as the agent of its Delivery Employees in negotiating sales with large retailers, but that the Delivery Employees, as the "principals," would ultimately make such sales and reap profits accordingly. In exchange, Delivery Employees pay a large sum (with interest) for a route or territory in which they get to carry out this "independent business" and take on responsibility for certain business risks and losses.

86.    These representations were and are false and Flowers knew they were false when it made them. Flowers never intended to implement the business model it advertised and described in its standard DA. Rather, Flowers operated and continues to operate its business using Delivery Employees to carry out distribution and merchandizing of Flowers' products after Flowers, itself, made direct sales to large retailers, under Flowers' strict control. Flowers, in reality, and contrary to what it represented to its Delivery Employees, recognizes itself as the principal and the Delivery Employees as the agent with respect to retail sales. In truth, Flowers makes retail sales and recognizes revenue based on retail sales, and it is the Delivery Employees who acts as the agent in carrying out the distribution and merchandizing required under Flowers' contracts, for a commission limited to Flowers' sales price. Flowers operates under this same model despite its promises to the contrary in the DA.

87.    Flowers omitted and intentionally failed to disclose the true nature of its operation to Delivery Employees when entering into the DA contract.

88.    Flowers intended for the Delivery Employees, like Plaintiff, to rely, and they did in fact rely, on Flowers' representations regarding the independent nature of Delivery Employees' businesses and on the representation that the Delivery Employees are the ones controlling the sales to end retailers.

89.    Plaintiff's and his fellow workers' reliance in this regard was reasonable because Delivery Employees did not and could not know that Flowers intended to and did operate its business in a different manner than what is set out in the DA and related disclosures.

90.    Flowers' misrepresentations and omissions, and Plaintiff's and the California Class' justifiable reliance thereon, caused Plaintiffs and the California Class harm.  Plaintiffs and the California Class were harmed and continue to be harmed by Flowers' false statements and omissions regarding the true nature of Flowers' DSD model. These false statements and omissions led Plaintiffs and his

fellow Delivery Employees, for example, to enter into DA contracts with Flowers, to pay significant territory payments and other fees imposed by Flowers, and to take responsibility for business risk and loss which they would not have paid and taken responsibility for had they known the true facts and circumstances.

91.    If Flowers had disclosed the true nature of the relationship between the parties—that Delivery Employees are merely Flowers' employees charged with delivering and merchandizing products that Flowers sells for a commission, while remaining liable for offsetting Flowers' business losses (stale product and unaccounted for inventory at retail locations) and paying bogus territory fees—Plaintiffs and the California Class would not have executed the DA presented by Flowers or would have insisted on materially different terms.[10]

92.    As such, Plaintiffs are entitled to and hereby seeks all available remedies and compensation for all damages suffered, including, but not limited to, compensatory damages, punitive damages, interest, rescission, restitution, and an injunction prohibiting such conduct and misrepresentations in the future.

## X.    FOURTH CAUSE OF ACTION

### Failure to Pay Overtime under California Law
### (By Plaintiffs and the California Class Against Flowers)

93.    Plaintiffs incorporate each and every allegation contained above.

94.    Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class.

95.    Under California Labor Code Section 510 and the related Wage Orders, Plaintiffs and the California Class are entitled to receive overtime premium pay for hours worked over eight in a day or forty in a week. They are also entitled to overtime premium pay for hours worked on a seventh consecutive work day in a work week.

---

[10] In reality, these individuals *could not* agree to these terms in light of the blatant misclassification and violations of California's Labor Code that would result from such an agreement. The employee rights set out in the Labor Code are non-waivable. *See* Cal. Lab. Code § 2800, *et seq.*

96.   Flowers' Delivery Employees including Plaintiffs and his their Class members regularly worked and continue to work over eight hours in a day, between 55 and 70 hours per week, and 6 to 7 days per week in accord with Flowers' mandated schedule. Yet Flowers never paid Plaintiffs or their fellow Class members any of the overtime compensation they had earned.

97.   Flowers knows that these Delivery Employees are improperly classified and that they work well over 40 hours per week and eight hours in a day, but intentionally and willfully fails to provide overtime premium pay.

98.   Plaintiffs, on behalf of themselves and the California Class, therefore seek overtime premium pay, interest, costs, and attorney's fees pursuant to California law.

## XI.   FIFTH CAUSE OF ACTION

### Unlawful Deductions From Wages
### (By Plaintiffs and the California Class Against Flowers)

99.   Plaintiffs incorporate each and every allegation contained above.

100.   Plaintiffs bring this claim on behalf of himself and on behalf of the California Class.

101.   Under California Labor Code Section 221, it is "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." This protection extends to deductions for mistakes in employees' work or other non-malicious conduct. The IWC Wage Orders further provide that the only circumstances under which an employer can make a deduction from an employee's wage are due to cash shortage, breakage, or loss of equipment if the employer can show that the shortage, breakage, or loss was the result of the employee's gross negligence or dishonest or willful act.

102.   Despite this, Defendants made and continue to make numerous deductions from the wages of their misclassified Delivery Employees. Flowers withholds payments for the Delivery Employees' territories and for various

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

administrative expenses. Flowers also charges Delivery Employees for stale product returned from retail locations that exceeds a certain percentage of sales, passing off a business risk and cost to Delivery Employees that are properly born by the employer. Likewise, Flowers will hold Delivery Employees accountable for lost, missing, stolen, or otherwise unaccounted for products. The same is true where a retail location fails to pay for products as set out in the DA.

103.   As a proximate result of Defendants' unlawful conduct, Plaintiffs and the California Class sustained damages and are entitled to recover in the amount of these deductions, liquidated damages, interest, applicable penalties, attorney's fees, and costs.

## XII.   SIXTH CAUSE OF ACTION

### Failure to Indemnify for Necessary Expenditures
### (By Plaintiffs and the California Class Against Flowers)

104.   Plaintiffs incorporate each and every allegation contained above.

105.   Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class.

106.   California law and relevant wage orders require employers to indemnify employees for all necessary expenditures or losses incurred in direct consequence of the discharge of their duties. *See, e.g.,* Cal. Lab. Code § 2802.

107.   Flowers unlawfully failed to indemnify Plaintiffs and their fellow Class members for reasonable and necessary expenditures, including their vehicles, tools, cellular telephones, transportation expenses, insurance, uniform and laundry of the same, loss of product (such as stolen baked goods), among other expenses. Defendants often deducted (and continue to deduct) these expenses directly from wages.

108.   As a proximate result of Flowers unlawful conduct, Plaintiffs and the California Class sustained damages and are entitled to recover in the amount of these

deductions and unreimbursed expenses, along with interest, applicable penalties, attorney's fees, and costs.

## XIII.  SEVENTH CAUSE OF ACTION

**Failure to Provide Proper Wage Statements**
**(By Plaintiffs and the California Class Against Flowers)**

109.   Plaintiffs incorporate each and every allegation contained above.

110.   Plaintiffs bring this claim on behalf of themselves and on behalf of the California Class.

111.   The purpose for California's wage statement requirement, Labor Code section 226 et seq., is to ensure the employees are able to determine whether or not they are being paid their wages in accordance with California law. Under Labor Code section 226(h), "[a]n employee may also bring an action for injunctive relief to ensure compliance with this section, and is entitled to an award of costs and reasonable attorney's fees."

112.   Flowers violated the above statute by failing to provide accurate and complete paystubs/wage statements. Defendants' wage statements fail to accurately reflect hours worked, overtime pay, gross wages, net wages, and premium wages for failure to provide lawful meal and rest periods, among other shortcomings. Because Plaintiffs were not aware of what their true wages should be and how they were calculated, they suffered economic loss in the form of lower wages for their labor.

113.   Flowers' violations in this respect are ongoing and will continue until and unless this Court enters an injunction barring such violations. Plaintiffs therefore seek damages and injunctive relief pursuant to Labor Code section 226, including attorneys' fees and costs incurred therein.

114.   Plaintiffs and the California Class are entitled to recover applicable penalties, attorneys' fees, and costs.

# XIV.  **EIGHTH CAUSE OF ACTION**

## **Usury**
### **(By Lancaster and the Usury Sub-Class against Defendants)**

115.   Plaintiff Lancaster incorporates each and every allegation above.

116.   He brings this claim on behalf of himself and the Usury Sub-Class.

117.   As described in more detail above, Flowers sold (or facilitated the sale of) routes or territories to Delivery Employees.

118.   To bolster the appearance of an "independent business" operating the routes or territories, and to make more money off of the Delivery Employees, Flowers decided to "sell" these territories to Delivery Employees. But Flowers quickly realized there were no lenders willing to carry the hundreds of millions in notes that would be necessary to fund Flowers' national sale of routes, and that, therefore, they would have trouble finding people to work on or purchase the routes. Not wanting to miss an opportunity to get cheap labor, Flowers Foods, Inc. formed Flowers Finance, LLC, another wholly owned subsidiary, to finance the purchases of the routes. Over 85 percent of Delivery Employees nationally and in California use FloFin for financing and this entity currently has over $200,000,000 in notes receivable reflected on Flowers Foods, Inc.'s financial statements.

119.   FloFin – an entity that claims to have disbursed over $200,000,000 on behalf of Delivery Employees nationally – however, is merely a shell. It does not have any assets or even bank account. Nor is it registered as a financial lender in California. It has one employee – an administrative assistant in charge of keeping track of a spreadsheet or digital accounting ledger.

120.   Nonetheless, FloFin enters into contracts with Delivery Employees in California and other states promising to disburse the loan amount – usually around 95 percent of the route's selling price – to the regional Flowers' subsidiaries that are "selling" the territories or routes. In reality, FloFin does not disburse anything (because it has nothing to disburse) and Flowers simply records the amount due on

the note plus interest in its accounts receivable and then recognizes the proceeds from the route payments as they are collected each week by Flowers Bakeries, LLC. Flowers Foods, Inc. ultimately receives the revenue from these activities carried out at its direction by its wholly owned subsidiaries.

121.   Flowers Bakeries, LLC – the entity that collects and holds the loan and interest payments – and Flowers Foods, Inc. – the company that created FloFin and ultimately recognizes the profits from the principal and interest payments – are the alter egos of Flowers Finance, LLC – an entity with no capitalization, no bank account, and no business purpose aside from "financing" the sale of Flowers' territories, that could not meet a judgment rendered against it for usurious lending. FloFin also acts as the agent of Flowers in issuing the loans and associated interest rates.

122.   For its lending services, FloFin, and in reality Flowers, charges interest to Delivery Employees such as Lancaster. The rate charged is often over 10 percent (specifically 12.1677 percent for Lancaster who is currently paying off a note with FloFin).

123.   California's Constitution limits interest on loans to 10 percent. Anything above that is illegal usury.  *See* Article XV, § 1 of the California Constitution (the higher of 10 percent or 5 percent plus the prevailing rate of the Federal Reserve Bank) and Cal. Civ. Code § 1916 et seq. as stated in *Penziner v. West American Finance Co.*, 10 Cal.2d 160, 74 P.2d 252 (Cal. 1937). Whereas many registered financial institutions, like federally-chartered banks, are exempt from the 10 percent limit, FloFin is *not* exempt under any theory.[11]

---

[11] To register as a financial lender in California, an entity or individual must undergo background checks and prove certain levels of capitalization as a safeguard to the public. By foregoing these requirements, and in fact not even having a bank account or any capital for whatsoever, all while making millions of dollars in loans in California, Flowers and FloFin violated California law and public policy.

124.   FloFin intentionally and willfully entered into usurious lending contracts in California. These usurious rates result in substantial injury to Delivery Employees (and/or the corporations that Flowers forces them to create for the purposes of obtaining the financing from FloFin).

125.   Lancaster and the Usury Sub-Class have been damaged in amounts to be proven at trial.  They are entitled to and seek to recoup excessive interest paid under the FloFin notes, treble damages, and/or to rescind the interest component of their notes entirely. Lancaster and the Usury Sub-Class also seek a declaratory judgment that the interest provisions of the FloFin notes are void and that Defendants were not entitled to and should have to reimburse all interest paid on the notes.

## XV.   NINTH CAUSE OF ACTION

### Unfair Competition Law
### (By Lancaster and the Usury Sub-Class against Defendants)

126.   Plaintiff Lancaster incorporates each and every allegation above.

127.   He brings this claim on behalf of himself and the Usury Sub-Class.

128.   California's Unfair Competition Law, Business and Professions Code section 17200 et seq., defines unfair business competition to include "unlawful, unfair, or fraudulent" acts or practices. An unlawful practice violates any established state or federal law. An unfair practice, among other things, offends or violates a legislatively declared policy. A fraudulent practice is likely to deceive reasonable members of the public.

129.   The interest rates charged to members of the Usury Sub-Class are unlawful because they violate California usury laws, including the California Constitution, as discussed above.

130.   The interest rates charged to members of the Usury Sub-Class are unfair because they violate California's policy capping interest on non-registered financial institutions at 10 percent.

FIRST AMENDED CLASS AND COLLECTIVE COMPLAINT

131.   The interest rates charged to members of the Usury Sub-Class are also fraudulent. Within Flowers' sham business model, FloFin's note specifically claims that it will "disburse" the proceeds of the loan to the regional Flowers subsidiary so that the Delivery Employee like Lancaster can purchase the territory from Defendants. In exchange for FloFin disbursing these funds, the Delivery Employee pays large sums in interest. Yet, there is no money disbursed (i.e. money paid out from a fund) as FloFin has no money and no bank account. Instead, Flowers simply establishes for itself a right to deferred payment for the territory while charging exorbitant interest under the guise of a "disbursed loan."

132.   Through the above mentioned acts and practices, Defendants have unlawfully, unfairly, and fraudulently obtained and continue to obtain money from Lancaster and the Usury Sub-Class in California.   Lancaster, the Usury Sub-Class, and the general public have been injured and have lost money or property as a result of Defendants' unfair competition. Lancaster, therefore, seeks restitution of these ill-gotten gains on behalf of himself, the Usury Sub-Class, and the general public.

133.   Lancaster also requests on his behalf, on behalf of the Usury Sub-Class, and on behalf of the general public, an order enjoining Defendants from collecting interest and/or enjoining Defendants' collection of interest above the limits set by the California Constitution. Without an injunction, Lancaster and the Usury Sub-Class will suffer irreparable harm in the form of excessive interest payments. The exact extent, nature, and amount of such injury is difficult to ascertain at this time. Plaintiff Lancaster has no plain, speedy, and adequate remedy at law.

134.   The success of Plaintiff in this action will result in the enforcement of important rights affecting the public interest by conferring a significant benefit upon the general public.   Furthermore, private enforcement of these rights is necessary as no public agency has pursued enforcement.   There is a financial burden incurred in pursuing this action, and it would be against the interests of justice to require the payment of attorneys' fees from any recovery in this action.

135.   Lancaster and the Usury Sub-Class also seek a declaratory judgment that the interest provisions of the FloFin notes are void and that Defendants were not entitled to and should have to reimburse all interest paid on the notes. *E.g. Epstein v. Frank*, 125 Cal. App. 3d 111, 122, 177 Cal. Rptr. 831, 837 (Ct. App. 1981).

## XVI.  REQUEST FOR JURY TRIAL

Plaintiffs hereby requests a trial by jury.

## XVII. PRAYER FOR RELIEF

Plaintiffs prays for judgment against Defendants, as follows:

1.   For compensatory damages according to proof;

2.   For enhanced damages, liquidated damages, and penalties as permitted under federal law and California law, (not including PAGA at this time);

3.   For disgorgement of all monies which Defendants have illegally gained;

4.   For restitution according to proof at trial;

5.   For an order enjoining Defendants from any further acts and practices which violate the UCL;

6.   For declaratory relief finding that Defendants' business practices described in this Complaint violate the UCL and other California law;

7.   For punitive damages under Plaintiff's "Fraud" Cause of Action;

8.   For pre-judgment interest;

9.   For costs of suit;

10.   For reasonable attorneys' fees;

11.   For treble and/or punitive damages as permitted by statute and/or as the Court deems just and appropriate;

1      12.     For a declaration that all interest charged to Lancaster and the Usury

2                 Sub-Class are void and owing; and

3      13.     For such other and further relief as this Court may deem just and proper.

5  Respectfully submitted:

6  DATED:  February 21, 2019            **NICHOLAS & TOMASEVIC, LLP**

7                        By:     *  /s/ Alex Tomasevic*

                               Craig M. Nicholas

8                                 Alex Tomasevic

                               Shaun Markley

9                                 225 Broadway, Floor 19

                               San Diego, California 92101

10                                Telephone: (619) 325-0492

                               Facsimile: (619) 325-0496

11                                Email: cnicholas@nicholaslaw.org

                               Email: atomasevic@nicholaslaw.org

12                                Email: smarkley@nicholaslaw.org

13                                Attorneys for Plaintiff