UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL LUDLOW, individually and on behalf of others similarly situated; and WILLIAM LANCASTER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FLOWERS FOODS, INC., a Georgia corporation; FLOWERS BAKERIES, LLC, a Georgia limited liability company; and FLOWERS FINANCE, LLC, a limited liability company,<br><br>Defendants. | Case No.: 18cv1190-JO-JLB<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR FLSA DECERTIFICATION AND PLAINTIFFS' MOTION TO SEAL** |

Plaintiffs are current and former delivery workers alleging that Defendants intentionally misclassified them as independent contractors instead of employees. They claim that Defendants did so in order to avoid paying them overtime and providing them with other employment benefits. Plaintiffs filed a wage and hour complaint asserting a collective claim under the Fair Labor Standards Act ("FLSA") and class action claims under the California Labor Code. Dkt. 56 (FAC).[1]

---

[1] On July 5, 2022, the Court granted Plaintiffs' motion for class certification of the Labor Code claims. Dkt. 312.

1

On March 29, 2022, Defendants filed a motion for decertification of the FLSA collective action. Dkt. 213. In connection with this briefing, Plaintiffs filed a motion to seal exhibits submitted in support of their opposition to the decertification motion. Dkt. 303. For the reasons discussed below, the Court denies Defendants' motion for decertification of the FLSA class and Plaintiffs' motion to seal.

## I. BACKGROUND

Defendant Flowers Foods, Inc. ("Flowers Foods") is the national bakery company behind popular brands such as Wonder Bread, Nature's Own, and Dave's Killer Bread. FAC ¶ 21; Dkt. 302-3 (Declaration of Shaun Markley in support of Plaintiffs' Opposition to FLSA Decertification, "Markley Decl."), Ex. 1. Flowers Foods describes itself as "America's premier baker" that "produces and markets bakery products" in the "retail and food service" market. Markley Decl., Ex. 1. Flowers Foods claims in its SEC filings that it is the "second largest producer and marketer of packaged bakery foods in the US" and "operate[s] in the highly competitive fresh bakery market." *Id.*, Ex. 2 at 11. Its customers are retail and foodservice locations such as Sonic and Walmart. *Id.*, Exs. 16, 17. With sales of $3.9 billion in 2017, Flowers Foods generates revenue from sales of bakery products to its retail and foodservice customers. *Id.*, Ex. 1. As such, one of Flowers Foods' key business functions is the distribution and delivery of these packaged bakery goods to its customers. *See* Markley Decl., Exs. 1–4.

Flowers Foods engages the services of delivery workers by having its operating subsidiaries enter into "Distributor Agreements" with them. Flowers Foods is the sole parent company of Defendant Flowers Bakeries, LLC ("Flowers Bakeries"), which in turn operates as the sole parent company of numerous non-party operating subsidiaries located throughout California and the United States. *See* FAC ¶¶ 17, 18; *see* Markley Decl., Exs. 2–3. The local operating subsidiaries enter into standard and substantially identical Distributor Agreements with all of Flowers Foods' delivery workers. *See* Markley Decl., Exs. 5–6. Under these agreements, these so-called "distributors" such as Plaintiffs

contracted to deliver the bakery products from Defendants' warehouses to the retail and foodservice customer locations. *See id.*, Exs. 1–2.

The Distributor Agreements set forth the working relationship between the delivery worker and Defendants. *See* Markley Decl., Ex. 6. The Distributor Agreement labels the delivery workers as "distributors" and "independent contractors." *Id.* at § 16.1. A prospective distributor purchases the right to deliver Defendants' bakery products in a specific geographic territory. *Id.* at § 2.4. Purchasing the rights to a territory entitles the distributor to deliver specific bakery products to specific customer locations within the given territory. *Id.* at §§ 2.2–2.3. The distributor can purchase and own more than one territory or resell his or her territory to another person for a profit. *Id.* § 15.1. The distributor may also hire helpers to service his or her territory while he or she holds other full-time jobs (so-called "absentee" distributors). *Id.* § 16.2.

These Distributor Agreements also describe how the distributor purportedly earns money with these territory rights. Under the Distributor Agreement, a distributor "purchases" bakery products from Defendants and then "re-sells" those products to the retail and foodservice customers within their given territory. *See* Markley Decl., Ex. 6 at §§ 4.1, 8.6. A distributor earns money based on the standard margin—the difference between the purchase price and the sale price—which is set by the operating subsidiary based on its negotiations with the customers on the product price. *See* Markley Decl., Exs. 3, 21–22. A distributor must sell any unsold bakery products back to Defendants at a price set by the subsidiary. Ex. 6 at § 12.2.

The Distributor Agreements also set forth the quality standards that distributors must meet as part of their job requirements. For example, the Distributor Agreement requires the distributor to perform his or her services in accordance with "the standards that have developed and are generally accepted and followed in the baking industry," which specifically includes maintaining an adequate and fresh supply of products in the stores, actively soliciting stores not being serviced, properly rotating the products, promptly removing stale products, maintaining proper service per the store's requirements, and

maintaining equipment in sanitary and safe conditions. Markley Decl., Ex. 6 at § 2.6; *see also* Ex. 3. The Distributor Agreement also requires the distributor to obtain his or her own delivery vehicle and insurance, and to keep the delivery vehicle clean, professional, and safe. Ex. 6 at § 9.1. The Distributor Agreement further requires the distributor to use Flowers Foods' "proprietary administrative services" to collect sales data or prepare sales tickets. *Id.* at § 10.1.

Flowers Foods also manages the distributors' work through its local subsidiaries. Flowers Foods expects the distributors to adhere to specific customer requirements. *See* Markley Decl., Exs. 27–30. These customer requirements include dress codes, product handling protocols, and other codes of conduct. *See, e.g.*, Ex. 27 at § 3. Therefore, Flowers Foods' operating subsidiary bakeries employ managers to train, monitor, and assist distributors in the daily operation of their territories to ensure that they adhere to these requirements. *Id.*, Ex. 10. Its managers field complaints from the customer retail stores regarding distributors and may escalate the issues to upper management for review and possible termination. *See id.*, Exs. 4, 11. If a distributor fails to make its delivery services, the subsidiary sends a breach letter and threatens termination of the relationship. *See* Markley Decl., Exs. 19, 20. Furthermore, each of the subsidiaries has a distributor relations department that manages distributor work disputes, sells various insurance program benefits that are automatically deducted from the distributor's pay, and processes final paychecks. *See* Markley Decl., Ex. 4.

The Distributor Agreement sets an indefinite duration for the working relationship between the distributor and Defendants. Under the Distributor Agreement's terms, the distributor relationship continues unless the distributor sells the territory, the Flowers Foods subsidiary ceases to use distributors in a territory for "business reasons," or the subsidiary terminates as a result of the distributor engaging in certain enumerated activities deemed non-curable or repeated curable breaches. Markley Decl., Ex. 6 at §§ 3.1, 17.1.

On February 21, 2019, Plaintiffs filed their First Amended Complaint alleging a FLSA claim for failure to pay overtime on behalf of themselves and the FLSA collective

class. Dkt. 56 (FAC). Plaintiffs asserted a FLSA collective class defined as "All persons who worked pursuant to a 'Distributor Agreement' or similar arrangement with Flowers Food, Inc., or one of its subsidiaries, in California that were classified as 'independent contractors' during the period commencing three years prior to the commencement of this action through the close of the Court-determined opt-in period." FAC ¶ 42. Over one hundred plaintiffs have filed opt-in forms to the FLSA claim (the "opt-in Plaintiffs"). *See* Dkts. 19, 86, 96, 97, 114, 125, 146, 227, 251, 261, 256, 258, 265.

## II. LEGAL STANDARD

The FLSA provides a mechanism for workers to pursue their claims under the statute jointly as a collective action. 29 U.S.C. § 216(b). It specifies that workers may litigate as a group if they claim a violation of the FLSA, are "similarly situated," and affirmatively opt into the joint litigation in writing. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018) (citing 29 U.S.C. § 216(b)). The plaintiffs bear the burden to show that they are "similarly situated." *Id.* at 1117–18.

The Ninth Circuit has instructed that opt-in plaintiffs are "similarly situated" if they "share a similar issue of law or fact material to the disposition of their FLSA claims." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 948 (9th Cir. 2019) (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)). So long as the proposed collective class's "factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id.* The "similarly situated" standard does not, unlike a Rule 23 analysis, require a strict inquiry into the procedural benefits of a collective action. *Campbell*, 903 F.3d at 1115. This collective treatment of similar claims in the workplace furthers the "broad remedial goal of the [FLSA, which] should be enforced to the full extent of its terms." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989).

Furthermore, a FLSA collective action is governed by different standards than a class action under Federal Rule of Civil Procedure Rule 23. Unlike a Rule 23 class action in which a district court must affirmatively allow a class to proceed, workers may initiate

a FLSA collective action simply by filing opt-in forms with the district court. *Campbell*, 903 F.3d at 1101. After the collective action proceeds through discovery, an employer can move to "decertify" the FLSA class by showing, based on the factual record, that the opt-in plaintiffs are not "similarly situated" to the named plaintiffs. *Id.* at 1102, 1109. At this stage, "the plaintiff bears a heavier burden" to show that they are similarly situated. *Id.* at 1117–18.

## III. DISCUSSION

The opt-in Plaintiffs brought a collective action under the FLSA alleging Defendants failed to pay distributors overtime based on the alleged misclassification as independent contractors. *See* 29 U.S.C. § 207. Defendants moved to decertify the collective action on the grounds that the opt-in Plaintiffs are not "similarly situated" under the FLSA's joint employer test or employee-independent contractor tests.

**A. Joint Employer Test**

First, Defendants argue that a joint employer determination—whether Defendant Flowers Foods and its operating subsidiaries are joint employers of the opt-in Plaintiffs—is a threshold issue that will require an individualized inquiry. On that basis, they argue that decertification is warranted.

Under the FLSA, an entity is a "joint employer" with another entity if it has joint control over the terms and conditions of a worker's job. *See* 29 U.S.C. § 203(d); 29 C.F.R. § 791.2. An entity may be liable for FLSA overtime claims as a joint employer if it acted directly or indirectly in the interest of an employer regarding an employee. *See* 29 C.F.R. § 791.2. To determine whether a defendant is a joint employer under the FLSA, courts consider "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), disapproved of on other grounds by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

In this case, whether parent company Flowers Foods exercised sufficient control over the opt-in Plaintiffs to qualify as their joint employer with the local subsidiaries will rest on similar legal and factual issues shared by the collective class. As set forth above, this analysis involves common questions like, (1) whether Flowers Foods had the power to hire and fire the distributors, (2) whether it had a role in supervising and controlling the distributors' work schedules or work conditions, (3) whether it determined their pay rate and method, and (4) whether it maintained employment records for the distributors. *Bonnette*, 704 F.2d at 1470. The answers to these questions largely hinge on common evidence regarding the respective roles and responsibilities of the parent company, the operating subsidiary, and the delivery workers such as, (1) the substantively identical Distributor Agreements entered between all the local subsidiaries and the delivery workers, and (2) other evidence of statewide practices regarding the management of these delivery workers. For example, the common Distributor Agreement set forth the local subsidiary's right to terminate a distributor if he or she fails to adhere to customer requirements or make the deliveries according to enumerated quality standards. *See* Markley Decl., Ex. 5 at § 17.1; Ex. 6 at § 17.1; Exs. 19, 20. The Distributor Agreement also describes the local subsidiary's ability to control the distributors' pay by setting the price at which the distributors "purchase" the baked goods from Flower Foods, the price at which they "sell" these baked goods to Flowers Foods' customers, and the price at which they must "sell back" any unsold baked goods to Flowers Foods. *See* Ex. 6 at §§ 4.1, 8.6. Furthermore, the opt-in Plaintiffs have submitted evidence that all the local subsidiaries across California hired managers to monitor the distributors and ensure they complied with Flowers Foods' customer service requirements. *See* Markley Decl., Exs. 8, 10. All the operating subsidiaries also had the ability through their distributor relations departments to process distributor insurance program benefits, deduct from their paychecks, and process their final paychecks. Markley Decl., Ex. 4. The Distributor Agreement is silent on whether Flower Foods, the parent corporation, had a role in performing the functions of hiring and firing, supervising, determining pay, and keeping records—the parent corporation either had no

role in these decisions, or it had a degree of involvement that is not apparent in the Distributor Agreements. However, the standard companywide nature of Flowers Foods' corporate practices regarding its distributors—the fact that neither the Distributor Agreements nor the corporate practices for managing the distributors varied by subsidiary or locality—suggests that the parent corporation's degree of involvement and control, whether high or low, is the same across the collective class members that perform work for their respective subsidiary. Defendants have not provided any evidence to show that Flowers Foods implemented the above practices, which determine the working relationship and degree of control between the subsidiaries and distributors, differently across the subsidiaries. From this evidence, it appears Flowers Foods and its subsidiaries did or did not jointly control each member of the collective class to the same degree. Because the proposed collective class of distributors shares these similar issues of law or fact material to the disposition of the joint employer inquiry, the Court concludes that decertification is not warranted. *Senne*, 934 F.3d at 948.

**B. Employment or Independent Contractor Relationship**

Having determined that the opt-in Plaintiffs are similarly situated with regard to the joint employer question, the Court next turns to Defendants' argument that an individualized inquiry would be necessary to determine whether opt-in Plaintiffs are employees rather than independent contractors under the FLSA.

To determine whether an employment relationship exists under the FLSA, courts have adopted the "economic realities test," which focuses on whether the worker is dependent on the company to which they provide services. *See Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979). Under the economic realities test, a court examines the following non-exhaustive factors to determine whether a worker is an employee or an independent contractor: "(1) the degree of the alleged employer's right to control the manner in which the work is performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

(4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business." *Id.* The presence of any individual factor is not determinative; rather, "such determination depends 'upon the circumstances of the whole activity.'" *Id.* at 754–755 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). Notably, courts have adopted "an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA." *Id.* at 754.

As with the joint employer analysis, the Distributor Agreement provides common proof of many of the above "economic realities" factors that bear on whether an employment relationship exists. For example, courts consider whether an alleged employee's work "requires a special skill," *Real*, 603 F.2d at 754, because work that requires a high degree of skill often reflects an independent contractor relationship. *See, e.g.*, *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1069 (N.D. Cal. 2015). The substantively identical Distributor Agreements that all opt-in Plaintiffs signed defines the scope of the job duties. The local subsidiaries require each distributor to deliver the bakery products to various customer locations by driving their delivery vehicles. *See* Markley Decl., Ex. 6 at §§ 4.1, 8.6, 9.1. They also require each distributor to properly stock and maintain the store shelves with bakery products. Markley Decl., Ex. 6 at § 2.6. By defining the scope of job duties for each opt-in Plaintiff, these standard Distributor Agreements provide common proof of the complexity or degree of special skill required for the distributor job.

The Distributor Agreement also provides common proof regarding the permanence of the working relationship between the distributors and the company. The fact that a worker has "continuously" provided services to the alleged employer for a "long period[] of time" will weigh in favor of an employment relationship. *See Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir. 1981); *see also, e.g.*, *Torres-Lopez v. May*, 111 F.3d 633, 644 (9th Cir. 1997). The Distributor Agreement governs the working relationship between all distributors and the subsidiaries. For each opt-in Plaintiff, the Distributor Agreement specifies that the working relationship continues indefinitely; this

long-term working relationship does not end unless the distributor or the subsidiary terminates the relationship. Markley Decl., Ex. 6 at §§ 3.1, 17.1. By governing the length of the working relationship between the company and each opt-in Plaintiff, the Distributor Agreement provides common proof of the permanence of the working relationship envisioned by the parties.

The Distributor Agreement further provides common proof regarding a distributor's opportunity for profit or loss. A worker's opportunity for profit or loss turns on "the managerial skills of [the alleged employer]" versus "the [worker's] own judgment and industry." *See Real*, 603 F.2d at 755. In other words, this inquiry considers whether the worker makes money based on his or her own entrepreneurial acumen, which leans toward an independent contractor relationship. The standard Distributor Agreement governs the parameters of the distributors' opportunities to purchase and sell routes, how distributors earn money from their delivery of the baked goods, and other opportunities to earn money through the distributor services. *See* Markley Decl., Ex. 6 at §§ 2.4, 16.2. By describing the distributor's various methods of earning money for their services, the Distributor Agreement provides common proof of the opt-in Plaintiffs' opportunities for profit or loss.

Finally, common proof will determine whether the distributor's service is central to Defendants' business. If the worker plays an integral role in the alleged employer's business, the arrangement is more akin to that of an employee-employer relationship. *See Real*, 603 F.2d at 754. As explained above, the standard Distributor Agreement details the distributor's specific job requirements and responsibilities. *See generally* Markley Decl., Ex. 6. Common evidence such as corporate filings regarding Flowers Foods' business operations and financial performance also describes the nature of Defendants' business. *See, e.g.*, Markley Decl., Ex. 1; Ex. 2 at 11. Because these common corporate filings evidence the nature of Flowers Foods' business and the common Distributor Agreement shows what work the distributors perform, they provide common, class-wide evidence regarding the opt-in Plaintiffs' role in Defendants' overall business structure.

The above issues are only a few non-exhaustive examples of similar legal and factual issues concerning the distributor plaintiffs that are material to the resolution of their FLSA claim. *See Senne*, 934 F.3d at 948. Defendants argue that the Motor Carrier Act exemption and the outside sales exemption are individualized defenses that defeat collective treatment. The Court disagrees. Even if these defenses involved individualized inquiries, the law is clear that given the existence of similar material issues of fact or law—and the Court has identified several above—dissimilarities in other respects do not defeat collective treatment. *See Campbell*, 903 F.3d at 1114. Accordingly, the Court denies Defendants' motion for decertification of the FLSA action.

## IV. MOTION TO SEAL

Plaintiffs filed a motion to seal exhibits submitted in connection with their opposition to Defendants' motion for decertification, on the grounds that the exhibits contain material previously designated by Defendants as "CONFIDENTIAL" under the terms of the Protective Order. Dkt. 303. The public has a "right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). In considering a sealing request, the court thus begins with "a strong presumption of access [as] the starting point." *Id.* A party seeking to seal a judicial record associated with a dispositive motion bears the burden of overcoming this strong presumption by "articulat[ing] compelling reasons supported by specific factual findings" for the sealing. *Id.* Plaintiffs do not contend that these exhibits are confidential nor identify any specific harm that would arise from their disclosure. They seek to seal the exhibits only on the grounds that they had been designated "CONFIDENTIAL" pursuant to the Protective Order. This is insufficient to establish the "compelling reasons" required to justify sealing. Because Plaintiffs have not met their burden to demonstrate any compelling reasons to seal these exhibits, the Court denies the motion to seal without prejudice [Dkt. 303].

///

///

```
```
...

## V. CONCLUSION

For the reasons discussed above, the Court DENIES Defendants' motion for decertification of the FLSA claim [Dkt. 297]. The Court DENIES Plaintiffs' motion to seal [Dkt. 303] without prejudice to refiling.

**IT IS SO ORDERED**.

Dated: March 15, 2023

_____
Honorable Jinsook Ohta
United States District Judge